BRAZAUSKIS *v.* MUSKEGON COUNTY BOARD
OF ROAD COMMISSIONERS.

Workmen's Compensation — Dump-Truck Driver — Jumping to
Ground—Dependents—Equally Divided Court.
    Award to dependents of dump-truck driver who had leveled off
    his load, jumped to the ground, rolled under his truck and
    died about a year later from cerebral embolism is affirmed
    by an equally divided court.

Appeal from Workmen's Compensation Commission. Submitted January 12, 1956. (Docket No. 17, Calendar No. 46,516.) Decided April 2, 1956. Rehearing denied May 14, 1956.

Viola Brazauskis, widow, and minor children presented their claim for compensation against Muskegon County Board of Road Commissioners, employer, and Travelers Insurance Company, insurer, for death of Donald B. Brazauskis occurring a year following first blood clot in brain. Award to plaintiffs. Defendants appeal. Affirmed by an equally divided court.

*Marcus, Kelman, Loria, McCroskey & Finucan,* for plaintiffs.

*Warner & Hart,* for defendants.

Boyles, J. (*for affirmance*). Plaintiff, widow of one Donald B. Brazauskis, on filing an application

References for Points in Headnotes
3 Am Jur, Appeal and Error § 1160.

for dependency compensation on behalf of herself and 4 minor dependent children, was awarded workmen's compensation by the commission, under the workmen's compensation act, for the death of her husband. The defendant board of county road commissioners, his employer, and its insurance carrier appeal.

For about 8 months prior to his injury on November 7, 1951, the decedent was regularly employed as a dump-truck operator by the defendant county road commission. While he had a rheumatic heart condition, he worked regularly at manual labor. On November 7, 1951, he drove his truck up to a crane, to be loaded with gravel. After he received his load he drove a short distance away, stopped and climbed up on his load to level it. Having done so he jumped off the load onto the ground, a distance of at least 6 or 7 feet, and at once crawled or rolled under his truck. Another employee saw him, went at once and found him lying on his stomach or side, groaning and trying to get up, with "some white stuff coming out of his mouth." An ambulance was called and he was promptly taken to a hospital. He was found to be suffering from a cerebral thrombosis or embolism, his right side became totally paralyzed, he was never able to talk or work again, and died about a year later.

The physician who attended the decedent in the hospital November 7, 1951, testified that he diagnosed the decedent's condition at that time as a cerebral embolism, a blood clot in the brain occluding a blood vessel and causing paralysis. Answering a hypothetical question reciting the circumstances as they occurred on November 7th, he gave his opinion that there was no causal relationship between what had happened on November 7th and the decedent's death. On the contrary, the death certificate received in evidence gave the cause of death "old cerebral throm-

bosis, interval between onset and death 1 yr." A medical witness testified that "it was a cerebral embolism rather than a definite cerebral thrombosis, but the effects are very similar;" that both could very well lead to death. Dr. Boyd, who attended the decedent on November 8, 1951, testified that in his opinion the decedent "had rheumatic heart disease with mitral stenosis and mitral insufficiency according to his clinical findings. He had a right-sided paralysis, paralysis of his right arm and his right leg and a speech aphasia. * * * He had rheumatic heart disease and mitral stenosis and embolus to his brain—by an embolus we mean a blood clot and a paralysis of the right arm and right leg and of the speech center." He further testified:

"*Q.* So in this case, isn't it reasonable to suppose as did the medical examiner who wrote the death certificate that this man having had a cerebral thrombosis for 1 year, having been invalided and disabled for 1 year, and you know how badly hurt he was, that the old condition was a contributory cause to his death?

"*A.* It could be but I can't say that it was.

"*Q.* But it is a rational assumption, isn't it, doctor?

"*A.* It is a good possibility. * * *.

"*Q.* But you cannot eliminate the first stroke as an underlying cause to his death, is that correct? * * *

"*A.* It cannot be eliminated, no."

One Dr. Steiner, a professor in the College of Medicine at Wayne University, being asked a hypothetical question which gave in detail the facts and circumstances as they had occurred November 7, 1951, and later, testified:

"*Q.* Could there reasonably be any relationship between the incident when this man jumped off the

truck, and his disability and his ensuing death a little
over 1 year later?

"*A*. Yes. * * *

"*Q*. Could the jump off the truck, the top of a
truck, a gravel truck, in a pre-existing rheumatic
heart, dislodge an embolus and cause it to travel to
the right side of the brain causing a hemiplegia with-
in a matter of minutes?

"*A*. It certainly could.

"*Q*. In view of the history that I gave you of this
man never recovering, could that have reasonably led
to his death a year later?

"*A*. Oh, yes."

The crucial question seems to be whether there
was a causal connection between his jumping off the
truck, 6 or 7 feet, with an immediate embolism or
blood clot in the brain, and his death a year later.
The commission found "that there was a direct causal
relationship between the jumping incident and de-
cedent's subsequent disability and death. The medi-
cal testimony strongly supports this finding."

The instant case is somewhat similar to *Graham* v.
*City of Lansing,* 303 Mich 98, where we affirmed an
award. In that case an employee of the city of Lan-
sing, who had earlier suffered an amputation of his
left leg, below the knee, suffered an injury to the
stump of the leg when he jumped off the bed of the
city gravel truck where he was employed, as a result
of which he could not use his artificial limb and was
disabled. The plaintiff testified (p 100):

"*Q*. This action arose out of and in the course of
your employment? It was part of your job to ride on
this truck?

"*A*. Yes."

The Court said (pp 100, 101):

"In view of the foregoing and other portions of the
record, we think there clearly is competent testimony

tending to establish plaintiff's claim that he sustained an accidental injury which arose out of and in the course of his employment. The department so found, and we are bound by that determination."

The instant case is distinguishable on the facts from *Simpson* v. *Matthes,* 343 Mich 125, 129, where the Court said:

"The record in this case does not show that an unusual or excessive strain was imposed on plaintiff's physique, or that he exerted himself in a manner unusual to or greater than is ordinarily the case in the general field of common labor."

Likewise, in *Wieda* v. *American Box Board Co.,* 343 Mich 182, there was a complete absence of any unusual happening or fortuitous event which might be considered as a causation of the disablement. Quoting from *Robbins* v. *Original Gas Engine Co.,* 191 Mich 122, 128, the Court said (p 187):

" 'It is not sufficient that there be an unusual and unanticipated result; the means must be accidental—involuntary and unintended. There must, too, be some proximate connection between accidental means and the injurious result.' "

In that case the Court held (syllabus):

"An accidental injury, to be compensable under the workmen's compensation act, must be more than merely an unusual and unanticipated result; the means must be accidental—involuntary and unintended, and there must be some proximate connection between accidental means and the injurious result (CL 1948, § 412.1 *et seq.,* as amended)."

We are satisfied that the testimony as to what happened when the decedent jumped down from the truck shows that his cerebral embolism was caused thereby, and that it had a causal relation to his death.

"Under the workmen's compensation law the department of labor and industry is charged with the duty of considering the testimony offered by the parties, determining facts therefrom and drawing legitimate inferences from the facts found to be established by competent proofs and such findings and inferences, so supported, must be accepted by the Supreme Court (CL 1929, § 8451, as amended by PA 1943, No 245)." *Shaw* v. *General Motors Corporation* (syllabus), 320 Mich 338.

"Finding of workmen's compensation commission that 69-year-old plaintiff carpenter's disability was directly due to his injury, in disregard of the testimony of the medical experts that it was an aggravation of an arthritic condition known as osteoporosis, but supported by testimony of plaintiff must be accepted by the Supreme Court as conclusive (CL 1948, § 413.12)." *Arnold* v. *Ogle Construction Co.* (syllabus), 333 Mich 652.

See, also, *McVicar* v. *Harper Hospital,* 313 Mich 48, 53.

There was competent testimony to support the finding of the commission. Under such circumstances, we do not set aside the award.*

Finally, appellants argue that the employer did not have notice of the injury. However, the secretary of the defendant commission, whose duties included the handling of reports of injuries to employees, admitted on cross-examination that he received a telephone call at the time of the injury that something had happened to decedent and that he called a foreman and asked him to investigate the occurrence. Later, he was presented with an application in behalf of decedent for benefits under a group insurance plan afforded employees which contained the question "If accident, describe how and

---

* CL 1948, § 413.12 (Stat Ann 1950 Rev § 17.186).

where injured and what was being done," and the reply thereto was "Undetermined."

We find that defendants had the required notice and knowledge of the accident and injury.*

Award affirmed.

Kelly, J., concurred with Boyles, J.

Carr, J. (*for reversal*). Involved in the determination of this case is the question whether there was testimony before the commission to support a finding that plaintiffs' decedent sustained an *accidental* injury arising out of and in the course of his employment. It is agreed that on the 7th of November, 1951, Donald B. Brazauskis was employed by the defendant board and was at the time operating a truck in the hauling of sand and gravel. In accordance with the customary practice he placed his truck in a suitable position for loading, and that part of the operation was duly performed.

The sole eyewitness who testified on the hearing was the operator of a crane located on the premises. He stated that the truck, following the loading, was moved for a short distance toward the location of the crane. It was there stopped and Brazauskis then went on top of the load, presumably for the purpose of leveling it. The testimony of the witness as to what then occurred is as follows:

"*Q.* You saw him get up on top of the load?

"*A.* Yes.

"*Q.* Did you see him do anything on the top?

"*A.* I can't say that, no. He was making observations there, I took for granted he was going to do what all drivers do.

"*Q.* All you saw was when he got up on top of the load?

"*A.* Yes."

---

* See CL 1948, § 412.15 (Stat Ann 1950 Rev § 17.189).—Reporter.

"*Q.* And you saw him, as you say, jump from the top of the load?

"*A.* Yes, it appeared that way, that he jumped off.

"*Q.* Well, did you see him?

"*A.* Yes.

"*Q.* And did he go from the top of the load right to the ground, did he jump off?

"*A.* Yes.

"*Q.* Then you saw him crawl under his truck?

\*　\*　\*

"*A.* I said all the way through it appeared to me as he jumped off, and it appeared to me as he crawled under his truck or rolled under, whatever it was, it appeared that way from where I was sitting. I wasn't concerned about this, just a normal truck driver, normal thing, they do that, jump up and they jump down, they roll under, they crawl under, it is a very normal thing.

"*Q.* You don't know whether he crawled under or what?

"*A.* I said, it appeared he crawled."

Further testimony disclosed that other employees noticed Brazauskis beneath the truck, and after a short interval concluded that something was wrong. On investigation they found that he was ill and apparently unable to help himself in any way. An ambulance was called, he was taken to a hospital, and an examination indicated serious paralysis. Medical testimony offered on behalf of plaintiffs indicated that his condition may have resulted from the loosening of an embolus or blood clot, and the moving thereof in the blood stream to the brain. Further medical testimony tended to show the possibility of a causal connection between the occurrence on November 7, 1951, and the death of Brazauskis on November 26, 1952.

In accordance with the proofs the workmen's compensation commission in its opinion said:

"Decedent, as was customary, drove the truck a short distance away, climbed on top of the load and leveled it off. He then jumped from the top of the truck to the ground, a distance of about 6 or 7 feet. This was a customary and normal practice of the truck drivers. Within a period of 5 minutes from the time decedent jumped, he was observed lying on the ground under the truck."

The commission further stated its general conclusion that in jumping off the truck and loosening the blood clot Brazauskis had sustained an accidental injury. No specific finding was made to the effect that any accidental or fortuitous circumstance was involved in the act of Brazauskis in jumping from the truck to the ground. Under the proofs there was no basis for any such finding.

The testimony of the eyewitness indicated that it was customary and normal for truck drivers to jump from their loads to the ground after completing the leveling process, and that it was also not unusual for drivers to go under their trucks for purposes of examination following loading. There is nothing to suggest that Brazauskis stumbled as he jumped, that he lost his balance, that he failed to land on his feet in a proper and usual manner, or that he fell after reaching the ground. We may not indulge in speculation to the effect that any such element was involved. The loosening of the blood clot and the subsequent difficulty may have resulted from the act of Brazauskis in jumping from the truck even though he did so in the customary and normal way without any accidental or fortuitous circumstance. The testimony of plaintiffs' medical witness is consistent with such theory. It does not appear that his conclusions involved an assumption that there was any accident involved in the act of jumping from the truck.

The award of the commission was based on part 2

of the workmen's compensation law.* Pertinent provisions of the statute authorize the payment of compensation for *accidental* injuries arising out of and in the course of the employment. Such has been the construction placed thereon by this Court in numerous prior decisions. In *Kutschmar* v. *Briggs Manufacturing Co.,* 197 Mich 146 (LRA1918B, 1133), the plaintiff sustained a hernia while engaged in carrying on his work. It may be noted that the case arose prior to the addition of part 7 to the workmen's compensation act, containing provisions relating to disability from occupational diseases and from hernia. The case, however, is significant as bearing on the construction of part 2, particularly with reference to the meaning of the term "accidental" as used therein. In reversing the award made in plaintiff's favor, it was said (p 150):

"In the case at bar it conclusively appears from claimant's own testimony that he received no accidental injury. He was engaged at the moment of his injury in his usual and ordinary employment and in the usual and ordinary way. In the course of such employment it was his duty to lift the iron bar once in about every 15 minutes, about 90 or 100 times a day. We are of opinion that an employee who receives an injury in the nature of a hernia, while engaged in his usual and ordinary employment, without the intervention of any untoward or accidental happening, is not within the provisions of the compensation act, which as we have held provides compensation for *accidental* injury only."

It is conceded that for approximately 8 years prior to the occurrence of November 7, 1951, Brazauskis had a rheumatic heart condition. The testimony of plaintiffs' medical witness indicates that had it not

---

* PA 1912 (1st Ex Sess), No 10, as amended (CL 1948, § 411.1 *et seq.* [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.141 *et seq.*]).

been for such condition the act of jumping from the truck would not have produced the results that followed. In *Kasarewski* v. *Hupp Motor Car Corp.*, 315 Mich 225, the rule was recognized that the aggravation of a pre-existing condition, resulting in disability, is not compensable under part 2 of the workmen's compensation act unless caused by an accidental injury. See, also, in this connection *Nichols* v. *Central Crate & Box Company*, 340 Mich 232, 234, and prior cases there cited. The Court in the *Nichols Case* also referred to *Robbins* v. *Original Gas Engine Co.*, 191 Mich 122, 128, where it was said:

"It has been held that death resulting from a ruptured artery was not accidental when the rupture occurred while the insured was reaching from a chair to close a window, did not slip or fall or lose his balance, and nothing unforeseen occurred except the bursting of the artery. *Feder* v. *Iowa State Traveling Men's Ass'n*, 107 Iowa 538 (78 NW 252, 43 LRA 693, 70 Am St Rep 212). An examination of cases arising principally upon accident insurance policies, some of which are collected in a note to *Lehman* v. *Accident Ass'n*,* 42 LRA NS 562, discloses that in the opinions which seem to be best considered the distinction is observed between the means by which an injury is produced and the result of the producing cause or causes. It is not sufficient that there be an unusual and unanticipated result; the means must be accidental—involuntary and unintended."

Further statements in the opinion must be construed in the light of the subsequent decision in *Kutschmar* v. *Briggs Manufacturing Co., supra.*

In the *Nichols Case, supra,* it was contended on behalf of the plaintiff that an unexpected result, even though not connected with any fortuitous circumstance, may properly be regarded as accidental.

---

* *Lehman* v. *Great Western Accident Association,* 155 Iowa 737 (133 NW 752, 42 LRA NS 562).—REPORTER.

On the basis of prior decisions of this Court such claim was rejected, and it was held that:

"An accidental injury, to be compensable under the workmen's compensation act, must be more than merely an unusual and unanticipated result; the means must be accidental—involuntary and unintended, and there must be some proximate connection between accidental means and the injurious result (CL 1948, § 412.1 et seq.)." (Syllabus 2.)

A like claim was advanced by the plaintiff in *Wieda* v. *American Box Board Company,* 343 Mich 182. In accordance with earlier decisions of the Court, it was said:

"An unfortunate result may not be given the retroactive effect of making a particular event or happening accidental in nature which was not of such character when it took place."

In support of the conclusions reached in the *Nichols Case* and in the *Wieda Case* numerous prior decisions were cited, including *Hagopian* v. *City of Highland Park,* 313 Mich 608, and later decisions following the rule there laid down. A repetition of our previous discussions of the question involved here would serve no useful purpose. The situation is that this Court has repeatedly recognized the proposition that the fact that an occurrence is not attended by any accidental or fortuitous circumstance, although followed by an unexpected and unfortunate result, does not make the occurrence accidental within the meaning of part 2 of the workmen's compensation act.

Counsel for plaintiffs rely on *Watson* v. *Publix Riviera Theatre,* 255 Mich 115; and *Graham* v. *City of Lansing,* 303 Mich 98. In the *Watson Case* the plaintiff was an actor employed by defendant theater. As a part of his duties he was required at public performances to turn somersaults on a gymnastic facility commonly referred to as a "bounding

table." While so engaged his leg gave way and he fell. Subsequently it was ascertained that ligaments in one of his legs were torn and that the pelvic bones were twisted. The question at issue was whether his injuries were the results of an accident. The department of labor and industry found that they were, and this Court upheld the decision on the theory that there were proofs in the case supporting the conclusion. The testimony of plaintiff Watson, as set forth in the record in the case, clearly indicated an issue of fact. He described the nature of his performance, stating that for certain reasons he was anxious to display his ability on the occasion in question. He claimed that he did more somersaults than was customary for him, that his act involved a turning, that his leg gave way, and that he fell to the net, landing on his face. The torn ligaments and twisted pelvis resulted.

The facts established by the proofs in the instant proceeding are not analogous to those in the *Watson Case*. As before emphasized, the act of Brazauskis in jumping from his truck to the ground did not involve any occurrence of an accidental nature. It appears from the testimony that he did an ordinary act, in connection with his employment, in a proper and usual manner. Because of his pre-existing heart condition, an unfortunate result followed. However, such result may not be given the effect of transforming the occurrence into an accident.

In the *Graham Case* the plaintiff, who had an artificial leg, was in the process of alighting from a gravel truck. In order to do so he stepped on a hind wheel which, according to his testimony, was the only way he had to get off. The driver started the truck while plaintiff was in the act of climbing down to the ground, compelling the latter to jump. In doing so he injured the leg, causing the stump thereof to crack or split open. In sustaining an award of

compensation in his favor, this Court (pp 100, 101) held that there was "competent testimony tending to establish plaintiff's claim that he sustained an accidental injury which arose out of and in the course of his employment."

A situation somewhat comparable to that involved in the *Graham Case* was presented in *United States Mutual Accident Association* v. *Barry,* 131 US 100 (9 S Ct 755, 33 L ed 60). That was an action to recover under an insurance policy of indemnity against injury or death by accidental means. The proofs disclosed that the insured with 2 companions jumped from a platform, the former landing heavily on his heels in a manner that caused the others with him to inquire whether he had hurt himself. The trial court left to the jury the question as to whether there was anything accidental in the act of jumping from the platform to the ground. The issue was determined in favor of the plaintiff and the judgment based on the verdict was sustained. The court directed attention to the fact that the insured did not land on the ground in a proper or normal manner, indicating that on the record an issue of fact was presented. In discussing the matter, it was said, in part (p 121):

"It is further urged that there was no evidence to support the verdict because no accident was shown. We do not concur in this view. The 2 companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was, whether there was anything accidental, unforeseen,

involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

Each case of this nature must be determined on the basis of the facts involved. The decisions relied on by counsel for plaintiffs are distinguishable from the instant proceeding on the ground that here there is no testimony from which an inference may be drawn that the act of Brazauskis in jumping from his truck to the ground involved any element of an accidental or fortuitous nature.

The cause should be remanded to the workmen's compensation commission with directions to set aside the award made and to enter an order in accordance with this opinion.

DETHMERS, C. J., and SHARPE, and REID, JJ., concurred with CARR, J.

SMITH, J. (*for affirmance*). Here, again, we attempt the resolution of the verbal, insoluble, puzzle we have set up as a standard in these cases: Is the injury the unexpected result of ordinary work, or is it the ordinary result of unexpected work? With this case we plunge the deeper into the "Serbonian bog." The distinctions become more subtle and microscopic. Our Court necessarily divides and redivides as various fact differentiations are stressed.

In the interest of doing consistent justice in these cases we would do well to follow the example set by Florida (*Gray* v. *Employers Mutual Liability Insurance Co.* [Florida], 64 So2d 650) and abandon the artificial puzzle we have devised as a test of compensable injury. I agree with Mr. Justice BOYLES' result. *Wieda* v. *American Box Board Co.*, 343 Mich 182, dissent, 191.

BLACK, J. (*for affirmance*). For reasons given by Mr. Justice SMITH in the *Wieda Case*, cited by him above, I concur with his reasoning here.